**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Premier Funding Group LLC, | No. CV-14-01633-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Aviva Life and Annuity Company, et al., | |
| Defendants. | |

Defendants Anthony Lengeling and Aviva Life and Annuity Company have filed motions to dismiss. Docs. 26-28. Lengeling has moved to dismiss Premier's claims against him for lack of personal jurisdiction and failure to state a claim. Docs. 26, 28. Aviva has moved to dismiss most of Premier's claims for failure to state a claim. Doc. 27. The motions are fully briefed.[1] The Court will grant Defendant Lengeling's motion to dismiss for lack of personal jurisdiction and will grant in part Defendant Aviva's motion to dismiss for failure to state a claim.

**I.    Background.**

The heart of this case is a $566,850 loan that Plaintiff Premier Funding Group made on account of Defendant Richard Baldwin's alleged fraud. Baldwin was an insurance agent who had an agreement with Aviva Life and Annuity Company ("Aviva") – an Iowa corporation – to sell its insurance products. Doc. 84, ¶¶ 2, 18-19. In the spring

---

[1] The parties' request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

of 2011, Baldwin began to work with Gardner Brown to sell Aviva's life insurance policies to Mr. Brown's clients. *Id.*, ¶ 23.  Among Mr. Brown's clients are David and Victor Kimball ("Kimballs"), who live in Utah. *Id.*, ¶¶ 6-7, 38.  Although the Kimballs had completed much of the paperwork necessary to acquire life insurance policies for themselves, they ultimately informed Mr. Brown that they did not want to complete the transaction. *Id.*, ¶¶ 44-47, 57.  Brown passed this information along to Baldwin. *Id.*, ¶ 58.  Baldwin told Brown that he would nevertheless complete the underwriting on the Kimballs' application in case the Kimballs changed their mind. *Id.*, ¶ 59.

For the transactions involving the life insurance policies, Baldwin was working with Nicholas Larsen, a Utah resident, and the company that employed Larsen, Crump Life Insurance Services ("Crump"). *Id.*, ¶¶ 67, 93-94.  Crump is an independent wholesale distributor of life insurance that is incorporated in Pennsylvania. *Id.*, ¶¶ 3, 16. Baldwin and Larsen used Crump to process Aviva life insurance policy applications and Crump paid them commissions for their work. *Id.*, ¶¶ 47-48, 67.  At some point, Baldwin and Larsen allegedly forged the Kimballs' signatures on the documents necessary to complete the sale of the life insurance policies. *Id.*, ¶ 93.  Because the Kimballs were not paying for the policies, Baldwin used the financial services of Plaintiff, Premier Funding Group, LLC ("Premier"). *Id.*, ¶¶ 51, 78.

Premier is an Arizona company in the business of premium financing. *Id.*, ¶¶ 1, 51.  Premium financing involves a company loaning the funds necessary to pay the cost of insurance premiums. *Id.*, ¶ 26.  To obtain financing for the Kimballs' life insurance policies, Baldwin sent Premier promissory notes and other documents with the forged signatures of the Kimballs. *Id.*, ¶ 74.  Premier, following Baldwin's instructions, wired $566,850 to Action Valuation, Inc. *Id.*, ¶¶ 80-81.  Action Valuation wired the money either directly to Aviva or to Aviva through Crump. *Id.*, ¶ 83.  Aviva then issued the policies for the Kimballs and paid commissions to Baldwin and Crump. *Id.*, ¶ 84.[2]

---

[2] There was also an earlier transaction involving the wives of David and Victor Kimball. *Id.*, ¶ 63.  Although the complaint is not clear, Premier seems to allege that Baldwin fraudulently acquired life insurance policies for the Kimballs' wives.  He did so

1 Gardner Brown soon discovered that Aviva had issued the life insurance policies even though the Kimballs did not want them. *Id.*, ¶ 92. Mr. Brown's lawyer then contacted Aviva's senior counsel, Anthony Lengeling, an Iowa resident. *Id.*, ¶¶ 96-97. The Kimballs also wrote letters informing Aviva that they did not want the policies. *Id.*, ¶ 98. Soon after, Aviva terminated Baldwin's employment and began an investigation into the Kimballs' policies. *Id.*, ¶¶ 103-15. In January of 2012, Premier's counsel sent a letter to Lengeling demanding that Aviva hold in trust the money it had received for the Kimballs' life insurance policy. *Id.*, ¶ 109.

After receiving the letters, Aviva began to unwind the fraudulent transactions involving the Kimballs. *See id.*, ¶¶ 115-24. As part of this effort, Lengeling drafted a settlement agreement between the Kimballs and Aviva. *Id.*, ¶¶ 124-27. Lengeling wanted to include a confidentiality provision in the agreement that would prevent the Kimballs from revealing the contents of the agreement to Premier. *Id.*, ¶¶ 149-51. The Kimballs objected to the confidentiality provision, but ultimately signed the agreement. *Id.*, ¶¶ 152-55. The agreement included a confidentiality provision and stated that the Kimballs had never authorized the policies and that the policies would be considered void. *Id.*, ¶ 155. Premier alleges that the Kimballs intended for Aviva to repay Premier the money it had received for the voided policies. *Id.*, ¶ 158. But Aviva refused to return the $566,850 to Premier despite Premier's repeated requests. *Id.*, ¶ 175.

On February 6, 2014, Premier filed a lawsuit in Maricopa Superior Court. Doc. 1-3. Premier named Aviva, Crump, Richard Baldwin, Nicholas Larsen, Anthony Lengeling, and the Kimballs as defendants. *Id.* Premier subsequently dismissed its claims against the Kimballs. Doc. 1-3 at 97. On July 18, 2014, Defendants removed the case to this Court on the basis of diversity. *See* Doc. 1-2; Doc. 73 (finding diversity and

---

using the same methods as he did for David's and Victor's policies. *See id.*, ¶¶ 63-65. Although Premier wired approximately $521,100 to Aviva for the wives' policies, this amount apparently is not at issue because Baldwin repaid this amount to Premier. Doc. 84, ¶ 64 ("PFG financed the premium payments on the two wives' life insurance policies, sold the notes to Mr. Baldwin and PFG received the monies for the sold notes from Mr. Baldwin without any complaints, problems or other issues.").

- 3 -

1 denying motion to remand). Defendants Lengeling and Aviva have filed motions to dismiss. Lengeling argues that the Court does not have personal jurisdiction over him or, in the alternative, that Premier has failed to state a claim against him. Docs. 26, 28.[3] Aviva argues that most of Premier's claims against Aviva should be dismissed for failure to state a claim. Doc. 27.

## II.     Personal Jurisdiction.

### A.     Legal Standard.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). Arizona has authorized its courts to exercise jurisdiction over persons to the maximum extent permitted by the Due Process Clause of the Constitution. *See* Ariz. R. Civ. P. 4.2(a). Under the Due Process Clause, a federal district court may exercise jurisdiction over a person who is not physically present within the territorial jurisdiction of the court. *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). The nonresident generally must have certain minimum contacts with the forum so that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

A nonresident's contacts with the forum may allow a district court to exercise either general or specific personal jurisdiction. *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013), *cert. granted sub nom. Oneok, Inc. v. Learjet, Inc.*, 134 S. Ct. 2899 (2014). In this case, Plaintiff argues that the Court has

---

[3] Lengeling filed two separate motions under Rule 12(b). Docs. 26, 28. One motion argued lack of personal jurisdiction (Doc. 26) and the other argued failure to state a claim (Doc. 28). These motions were filed on the same day. Ordinarily, "a party that makes a motion under this [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). A party who fails to include a defense or objection in an earlier motion made under Rule 12 is deemed to have waived that defense. Fed. R. Civ. P. 12(h). Premier argues that Lengeling's defense of lack of personal jurisdiction should be deemed waived because it was not included in its motion for failure to state a claim. Premier is correct in that Lengeling should have included his Rule 12 defenses in one motion. Because the two motions were submitted on the same day, however, the Court will treat Lengeling's motions as being one motion.

- 4 -

specific but not general personal jurisdiction over Lengeling based on his intentionally tortious conduct. *See* Doc. 38 at 6. The Ninth Circuit uses a three-part test to analyze whether a party's "minimum contacts" satisfy due process for the exercise of specific jurisdiction. *In re Antitrust Litig.*, 715 F.3d at 741-42.[4] In tort cases, the inquiry under the first part of the test – which is determinative in this case – is whether a defendant purposefully directed his activities at the forum state. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). The Ninth Circuit evaluates "purposeful direction under the three-part 'effects' test traceable to the Supreme Court's decision in *Calder v. Jones* . . . . '[T]he 'effects' test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)) (citing *Calder v. Jones*, 465 U.S. 783 (1984)).

The effects test does not "'stand for the broad proposition that a foreign act with foreseeable effects in the forum state gives rise to specific jurisdiction.'" *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 675 (9th Cir. 2012) (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). Nor does the effects test mean that specific jurisdiction may be based solely on a defendant's knowledge that the subject of his tortious activity resides in a particular state. *See Walden*, 134 S. Ct. at 1125. Rather, the Court must always focus on the "'relationship among the defendant, the forum, and the litigation' [which] is the essential foundation of in personam jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). "The proper question is not where the plaintiff experienced a particular injury or effect but whether

---

[4] Under this three-part test, specific jurisdiction exists only if: (1) the defendant purposefully availed himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws, or purposely directed conduct at the forum that had effects in the forum; (2) the claim arises out of the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e., it is reasonable. *See In re Antitrust Litig.*, 715 F.3d at 741-42 (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).

1    the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 134
2    S. Ct. at 1125.

3         "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff
4    bears the burden of demonstrating that the court has jurisdiction over the defendant."
5    *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). "Where, as here, the
6    defendant's motion is based on written materials rather than an evidentiary hearing, the
7    plaintiff need only make a prima facie showing of jurisdictional facts to withstand the
8    motion to dismiss." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th
9    Cir. 2011). "The plaintiff cannot 'simply rest on the bare allegations of its complaint,'
10   but uncontroverted allegations in the complaint must be taken as true." *Id.* (quoting
11   *Schwarzenegger*, 374 F.3d at 800). The Court may not assume the truth of allegations in
12   a pleading that are contradicted by an affidavit, but factual disputes are resolved in
13   Plaintiff's favor. *Id.* (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280,
14   1284 (9th Cir. 1977)). If the plaintiff survives the motion to dismiss under a prima facie
15   burden of proof, the plaintiff still must prove the jurisdictional facts by a preponderance
16   of the evidence at a preliminary hearing or at trial. *Data Disc*, 557 F.2d at 1285 n.2.

17       **B.**    **Analysis.**

18        Anthony Lengeling is an Iowa resident who at all relevant times was located in
19   Iowa. Doc. 84, ¶ 8. Premier is an Arizona limited liability company whose individual
20   members are residents of Arizona and California. *Id.*, ¶ 1. Premier argues that Lengeling
21   "expressly aimed" tortious conduct at Premier in Arizona when he helped Aviva keep the
22   money that had been fraudulently obtained from Premier and crafted a settlement
23   agreement that would keep this fact secret from Premier. To be more specific, Premier
24   alleges that (1) Lengeling knew that Premier was based in Arizona; (2) he intentionally
25   defrauded Premier by helping Aviva keep the money that had originated with Premier;
26   (3) he attempted to cover up this fraud with a confidentiality provision in a settlement
27   agreement; and (4) he knew that these actions would cause Premier to suffer injury in
28   Arizona. *See* Doc. 38 at 8. Premier argues that this satisfies the effects test.

1 The Court disagrees. As established by *Walden v. Fiore*, personal jurisdiction does not exist merely because a person directs tortious conduct at another whom he knows resides in a particular state. 134 S. Ct. at 1125. Specific jurisdiction must be based on a person's contacts with the forum state, not on his contacts with the plaintiff. *See id.* at 1121 ("[T]he defendant's suit-related conduct must create a substantial connection with the forum State."). The Ninth Circuit has stated that the express aiming "requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft*, 223 F.3d at 1087; *see also Wash. Shoe*, 704 F.3d at 675. But this reasoning is not consistent with the Supreme Court's recent decision in *Walden*.

In *Walden*, two professional gamblers were traveling through a Georgia airport on their way home to Nevada. 134 S. Ct. at 1118. They were carrying with them $97,000 in cash. *Id.* Walden, an agent of the Drug Enforcement Administration, stopped the gamblers and seized the cash. *Id.* He suspected that the money came from drugs. *Id.* He drafted an allegedly false affidavit to show probable cause for forfeiture of the funds. *Id.* Ultimately, no forfeiture complaint was filed. *Id.* at 1120. The gamblers filed a *Bivens* claim against Walden in the federal district court in Nevada. *Id.* at 1120. The district court dismissed the claim for lack of personal jurisdiction and the Ninth Circuit reversed. *Fiore v. Walden*, 688 F.3d 558 (9th Cir. 2011). The Ninth Circuit found that Walden had "expressly aimed" his allegedly false affidavit at Nevada by submitting the affidavit with knowledge that it would affect persons with a "significant connection to Nevada." *Id.* at 581. The court stated that express aiming existed if the "*intended* impact [is] targeted at a known individual who has a substantial, ongoing connection to the forum." *Id.* at 578. In reversing, the Supreme Court disapproved of the Ninth Circuit's analysis:

> Rather than assessing petitioner's own contacts with Nevada, the Court of Appeals looked to petitioner's knowledge of respondents' 'strong forum connections.' In the court's view, that knowledge, combined with its conclusion that respondents suffered foreseeable harm in Nevada, satisfied the 'minimum contacts' inquiry. This approach to the 'minimum contacts' analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis. Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly

- 7 -

>directed his conduct at plaintiffs whom he knew had Nevada connections. Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections "decisive" in the jurisdictional analysis.

134 S. Ct. at 1124-25 (citations omitted).

Defendant Lengeling – at all times acting in Iowa – allegedly committed a tort against a company located in Arizona. The tort was helping Aviva keep money that belonged to Premier. But Lengeling did not reach out to Arizona to commit this act. Indeed, Premier wired the money to Aviva through a third-party company at an unspecified location. Doc. 84, ¶¶ 80-83. Thus, as the plaintiffs did in *Walden*, Premier is attempting to make Premier's connection with Arizona, not Lengeling's connection with Arizona, decisive in the jurisdictional analysis. *Walden* held, however, that Lengeling's tortious conduct combined with his knowledge that the injury would be felt by Premier in Arizona is not sufficient for personal jurisdiction. Premier must show that Lengeling expressly aimed his tortious conduct at *Arizona*, not simply at Premier.

Premier has pointed to a few contacts that Lengeling had with Arizona. These contacts are a series of e-mails and phone calls between Lengeling and Premier's counsel, who resides in Arizona. *See* Doc. 26-1. In its complaint, Premier alleges that it wrote a letter to Aviva, which Lengeling read, requesting that Aviva hold the "fraudulently procured monies" in a trust until the matter could be fully resolved. Doc. 84, ¶¶ 109-10. Lengeling later sent an e-mail to Premier's counsel stating that "Aviva has cancelled the Kimball policies and is considering this issue closed. We are not going to enter into any form of settlement agreement for the return of premiums." *Id.*, ¶ 156. In his motion to dismiss, Lengeling reveals that there were additional e-mails and phone calls regarding the return of the money. *See* Doc. 26-1.

Premier, however, does not allege that these communications were tortious conduct aimed at Arizona. Rather, the communications were the result of allegedly tortious conduct by Lengeling. More specifically, Lengeling committed his allegedly tortious act when he helped Aviva retain the money. His later communications with

Premier simply gave Premier notice of his actions. This fact makes this case distinguishable from cases on which Premier relies. In *Metro. Life Ins. Co v. Neaves*, 912 F.2d 1062 (9th Cir. 1990), there was a dispute over whom was the beneficiary of a life insurance policy. *Id.* at 1063-64. The defendant, who lived in Alabama and was a co-beneficiary of the policy, had sent a letter to the insurance company in California stating that the other co-beneficiary had died. *Id.* at 1064. The insurance company claimed that the defendant intentionally defrauded the company because she knew that the other co-beneficiary was still alive. *Id.* The Ninth Circuit found that the California district court had jurisdiction over defendant because she "purposefully directed her actions into [California]" by sending the letter. *Id.* at 1065. The letter was the fraudulent conduct, and for that reason the California court had jurisdiction over an Alabaman defendant.

In *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257 (9th Cir. 1989), a professor at University of Arizona sued his former employer who lived in Canada. *Id.* at 1257-58. A dean of the University of Arizona had telephoned the Canadian defendant who allegedly told the dean, in breach of a settlement agreement with the plaintiff, that the plaintiff had misused funds in his previous job. *Id.* at 1258. In finding that the Arizona district court had jurisdiction over the Canadian defendant, the Ninth Circuit emphasized that the "content of this telephone conversation is the source of this lawsuit." *Id.* Because the Canadian defendant allegedly committed a tort while communicating with a person in Arizona, the lower court had jurisdiction. *Id.* at 1259. Again, the communication with the forum state was the tortious conduct, and for that reason the effects test was satisfied.[5]

Premier does not allege that Lengeling's communications with Premier's counsel were tortious. Rather, Premier claims that Lengeling aided and abetted (Claim Twelve, Doc. 84, ¶¶ 332-60) Baldwin's fraud by helping Aviva retain the money that originated

---

[5] The reasoning in *Neaves* and *Brainerd* is admittedly not clear. Although these cases are distinguishable for the reasons mentioned, there are portions of the opinions that suggest that mere knowledge of the tort victim's domicile is sufficient to establish personal jurisdiction under the effects test. *See Neaves*, 912 F.2d at 1065; *Brainerd*, 873 F.2d at 1259-60. Such suggestions, however, are not consistent with *Walden*.

with Premier and by structuring a settlement agreement that would keep this a secret from Premier. *Id.*, ¶¶ 349-51. Premier has also claimed that Lengeling breached legal and equitable duties (Claim Thirteen, Constructive Fraud, *id.*, ¶¶ 361-68) to Premier because of this conduct. This conduct, however, took place in Iowa, where Lengeling and Aviva reside, and arguably in Utah, where the Kimballs reside. It did not occur in Arizona.

Personal jurisdiction does not exist "solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Premier has failed to make a prima facie case that the Court has personal jurisdiction over Anthony Lengeling and his wife. The Court, therefore, grants Defendant Lengeling's motion to dismiss for lack of personal jurisdiction (Doc. 26).

**III.    Failure to State a Claim.**

      **A.    Legal Standard.**

Defendant Aviva argues that all of Premier's claims against Aviva, except the claim of negligent hiring and supervision, should be dismissed under Rule 12(b)(6). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Legal conclusions couched as factual allegations are not entitled to the assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009), and therefore are insufficient to defeat a motion to dismiss for failure to state a claim, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). To avoid a Rule 12(b)(6) dismissal, the complaint must plead enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed.

1 R. Civ. P. 8(a)(2)).

**B. Choice of Law.**

As a preliminary matter, Premier and Aviva dispute whether Arizona or Utah law applies to the issues between them. When a conflict of law exists "in a diversity case, the district court must apply the choice-of-law rules of the state in which it sits." *Abogados v. AT & T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Arizona has adopted the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws. *See Bates v. Super. Ct.*, 749 P.2d 1367, 1369 (Ariz. 1988); *Garcia v. Gen. Motors Corp.*, 990 P.2d 1069, 1075-76 (Ariz. Ct. App. 1999).[6]

Aviva argues that the majority of the underlying events took place in Utah. Doc. 27 at 6. But the Restatement does not require the Court to decide which forum has the most contacts with all of the issues and parties in the case. Rather, contacts under the Restatement "are to be evaluated according to their relative importance with respect to the *particular issue*." Restatement (Second) of Conflict of Laws § 145 (emphasis added) (stating the "general principle" for deciding choice-of-law issues for tort claims). A court may apply the law of different forums to different issues. *Id.* § 145 cmt. d. Thus, even though many of the underlying facts in this case occurred in Utah, these facts are not relevant unless they directly pertain to the issues between Premier and Aviva.

The particular issues in this motion are claims sounding in tort and restitution that Premier has brought against Aviva. These claims can be summarized simply: Richard Baldwin (or an associate) forged the Kimballs' signatures on a life insurance policy and a

---

[6] The Court notes that the parties have not identified the conflict between Arizona and Utah law. In cases involving a choice-of-law issue, the parties usually first identify the conflict in question. *See, e.g.*, *Pounders v. Enserch E & C, Inc.*, 306 P.3d 9, 11 (Ariz. 2013). Identifying the laws that are in conflict can be critical to the choice-of-law analysis. *See* Russell J. Weintraub, *Commentary on the Conflict of Laws* 397 (6th ed. 2010). The Restatement requires careful consideration of the policies behind particular laws in deciding which forum has the "most significant relationship" with a particular claim. *See* Restatement (Second) of Conflict of Laws § 6. Regardless of the failure of the parties to identify the relevant conflict, the Court finds that Aviva has failed to make any successful argument that Utah law should apply.

- 11 -

request for financing. Baldwin presented the request for financing to Premier and Premier financed the premiums for the Kimballs' purported life insurance policies. The payments went to Aviva. When Baldwin's fraud came to light, Aviva kept the payments, thereby allegedly defrauding Premier and unjustly enriching Aviva. Except for the home of the Kimballs, none of these facts involve Utah. The only states implicated by these transactions are Arizona, where Premier is located, and Iowa, where Aviva is located. Although Aviva may have spent time in Utah uncovering the fraud and dealing with the Kimballs, none of that is directly relevant to Aviva's retention of the premiums.

Aviva's argument fails the Restatement's most significant relationship test. The applicable sections of the Restatement require a forum to have contacts with the relevant issues, and, under these sections, Arizona has the most contacts. *See* Restatement (Second) of Conflict of Laws §§ 145 (stating the "general principle" for choice-of-law for tort claims), 148 (giving specific rules for claims of fraud), 221 (giving specific rules for claims for restitution). The funds in question originated in Arizona. The funds were wired by Premier from Arizona to Aviva in Iowa. Aviva decided to retain the funds, and actually retained them, in Iowa. Although there might be an argument that Iowa has more significant contacts with the relevant facts than Arizona, Premier makes no such assertion. And as between Arizona and Utah, Arizona has the most significant contacts with the relevant events at issue in Premier's claim against Aviva. Furthermore, the general principles that govern choice-of-law issues do not require application of Utah law. *See id.* § 6.[7]

---

[7] Section 6(2) provides basic policy considerations that apply in every choice of law case. These include the needs of the interstate system, the policies of the forum, the policies of other interested states, the protection of justified expectations, the policies underlying the field of law, uniformity of result, and ease in determination of application of the law to be applied. Restatement (Second) of Conflict of Laws § 6(2). None of these factors clearly favors the application of either Arizona or Utah law. "The basic policy in the law of torts is to deter tortious conduct and provide compensation for the injured victim," *Gordon v. Kramer,* 604 P.2d 1153, 1156 (Ariz. Ct. App. 1979), but the Court cannot conclude that this policy favors Utah or Arizona law. Neither state's policies, nor the needs of the interstate system appear to favor one state over another. The factor regarding the protection of justified expectations does not cut in either party's favor. Premier may rightly assume that Arizona law will protect it from fraudulent transactions, and Aviva may rightly expect that Iowa law or the law of the insured's

1      The Court finds that Arizona law governs the issues between Premier and Aviva.

2      **C.     Analysis.**

3            **1.     Fraud.**

4      Aviva argues that Premier has failed to state a claim of fraud because Premier has not identified a misrepresentation that Aviva made to Premier.  Doc. 27 at 8-10.  Premier argues that Aviva's conduct amounts to a "ratification" of Baldwin's fraud and that this is sufficient to state a claim of fraud under Arizona law.  Doc. 40 at 8-10.

       In Arizona, a principal may be liable for an agent's fraud if the principal either authorized or ratified the fraud.  *See Jerger v. Rubin*, 471 P.2d 726, 730 (Ariz. 1970).  Arizona courts have expounded this principle of law in the context of misrepresentations by real-estate brokers:

> It is true that in a broker-negotiated sale, where the misrepresentation is by the broker, the property owner is bound by the broker's misrepresentations only when he was expressly authorized to make such representations or when the owner, after notice of the fraud, insists upon holding the purchaser to his bargain, thereby ratifying the alleged representations of the broker.

*Barnes v. Lopez*, 544 P.2d 694, 697-98 (Ariz. Ct. App. 1976) (citing *Jerger*, 471 P.2d 726; *Light v. Chandler Improvement Co.*, 261 P. 969 (Ariz. 1928)).  The Court sees no reason, nor has Aviva argued any, why this principle should not apply to this case.

       According to Premier's complaint, Richard Baldwin at all relevant times was acting as Aviva's agent.  Doc. 84, ¶ 19.  Baldwin defrauded Premier by presenting promissory notes that Baldwin knew had been forged.  *Id.*, ¶ 74.  Premier reasonably relied on these promissory notes when it wired $566,850 to Aviva to pay the premiums on the Kimballs' purported life insurance policies.  *Id.*, ¶¶ 74-83.  In Arizona, this conduct amounts to fraud.  *See Echols v. Beauty Built Homes, Inc.*, 647 P.2d 629, 631

---

forum (Utah) will govern an insurance policy.  As for "certainty, predictability, and uniformity of result," this factor does not clearly apply.  The comment to Section 6 states that "[p]redictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions."  Restatement § 6 cmt. i.  This factor may apply where parties contemplated their relationship in advance, but it appears to have little application here.  Finally, the Court finds that it would be equally easy to apply the law of Arizona or Utah.

- 13 -

(Ariz. 1982). Aviva received the $566,850 that originated with Premier. Doc. 84, ¶ 83. At some point after receiving the money, Aviva became aware that Baldwin had fraudulently obtained the life insurance policies and the money used to pay the premiums, *id.*, ¶¶ 96-105, but decided to keep the money, *id.*, ¶¶ 109, 156. Like a real-estate "owner, [who] after notice of the fraud, insists upon holding the purchaser to his bargain [with the agent]," *Barnes*, 544 P.2d at 698, Aviva may be liable for ratifying Baldwin's fraud. The Court will deny Aviva's motion to dismiss the fraud claim.

### 2. Insurance Fraud.

Premier argues, and the Court agrees, that Arizona law applies to the issues between Premier and Aviva. Yet for its claim of insurance fraud, Premier relies on Utah's insurance fraud statute and does not cite Arizona law. *See* Doc. 84, ¶¶ 260-76; Doc. 40 at 10-11. Premier argues that it may plead alternative, inconsistent theories of liability. *Id.* (citing *Arnold & Assocs., Inc. v. Misys Healthcare Sys.*, 275 F. Supp. 2d 1013, 1030 (D. Ariz. 2003)). But this does not mean that Premier may rely on laws that do not apply to this case. Premier apparently prefers Utah's statute because it makes it unlawful for an insurer to "knowingly accept[] a benefit from the proceeds derived from a fraudulent insurance act." Utah Code Ann. § 31a-31-103(3)(c). Arizona's insurance fraud statute does not have a similar statement. *See* Ariz. Rev. Stat. Ann. § 20-463. Premier does not explain, nor can the Court discern, how Arizona law supports its claim of insurance fraud. The Court will dismiss Premier's claim of insurance fraud.

### 3. Unjust Enrichment.

"To recover under a theory of unjust enrichment, a plaintiff must demonstrate five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). Under this law, Premier has alleged a plausible claim of unjust enrichment. When Premier wired $566,850 on account of Baldwin's misrepresentations, Aviva was enriched and Premier was impoverished by that

- 14 -

amount.  There is a clear connection between the enrichment and impoverishment, and there is an absence of justification.  Finally, if Premier's other claims fail as this case proceeds, there will be an absence of a remedy provided by law.

Aviva argues that "insurers who are deceived into issuing life insurance policies under misleading pretenses are often permitted to keep the premiums paid on those fraudulent policies," and cites many cases that have so held.  Doc. 27 at 12.  These cases are distinguishable, however, because either the insured or the third-party financer knew or had reason to know of the fraud.  *See, e.g.*, *PHL Variable Ins. Co. v. Sheldon Hathaway Family Ins. Trust ex rel. Hathaway*, No. 2:10-CV-67, 2013 WL 6230351, at *10 (D. Utah Dec. 2, 2013) (finding that parties were aware of the fraudulent scheme); *Carlton v. B&B Equities Grp., LLC*, 827 F. Supp. 2d 1235, 1247 (D. Nev. 2011) (finding that the third-party financer was "at least on inquiry notice of the illicit scheme"); *TTSI Irrevocable Trust v. ReliaStar Life Ins. Co.*, 60 So. 3d 1148, 1149 (Fla. Dist. Ct. App. 2011) ("Where a party wrongfully procures a life insurance policy on an individual in whom it has no insurable interest, the party is not entitled to a return of premiums paid for the void policy.").  Construing the facts in Premier's favor, Premier had no reason to know of Baldwin's fraud at the time it wired the money.  Furthermore, Aviva's argument that it would be inequitable to return the money to Premier is best resolved at a later stage in the litigation.  The Court will not dismiss Premier's claim of unjust enrichment.

### 4. Constructive Trust.

Premier lists "constructive trust" as a claim.  Doc. 84, ¶¶ 297-301.  As Aviva rightly points out, a constructive trust is a remedy, not a cause of action.  "A constructive trust is an equitable remedial device, generally used to prevent unjust enrichment.  In particular, a constructive trust will arise whenever it is inequitable that property should be retained by the legal title holder." *Burch & Cracchiolo, P.A. v. Pugliani*, 697 P.2d 674, 678 (Ariz. 1985) (citations omitted); *see King v. Uhlmann*, 437 P.2d 928, 936-37 (Ariz. 1968).  If Premier succeeds on the merits of its unjust enrichment claim, it may be entitled to a constructive trust, but it need not plead constructive trust as a claim.  To the

1  extent the complaint pleads constructive trust as a cause of action, that cause of action is
2  dismissed.

### 5. Conversion.

"Conversion is the 'act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another.' To maintain such an action, the plaintiff must have the right to immediate possession of the property at the time of the conversion." *Koss Corp. v. Am. Exp. Co.*, 309 P.3d 898, 914 (Ariz. Ct. App. 2013) (quoting *Case Corp. v. Gehrke*, 91 P.3d 362, 365 (Ariz. Ct. App. 2004)). "[M]oney can be the subject of a conversion action if the funds can be described, identified or segregated and there is an obligation to treat the funds in a specific manner." *Id.* Thus, to make a plausible claim of conversion under Arizona law, Premier must show, at the time of the alleged conversion, "(1) that [Premier] had a right to immediate possession of the Proceeds; (2) that the funds [Premier] seeks are described; (3) that the funds [Premier] seeks are identified or segregated; and (4) that [Aviva] had an obligation to treat the funds in a specific manner." *Liberty Life Ins. Co. v. Myers*, No. CV 10-2024-PHX-JAT, 2013 WL 530317, at *13 (D. Ariz. Feb. 12, 2013).

Premier argues that Aviva converted Premier's money – which had been wired to pay for the Kimballs' purported life insurance policies – when Aviva decided to keep the money after receiving notice of Baldwin's fraud. Doc. 84, ¶¶ 317-31. Aviva argues that it cannot be liable for conversion because Premier voluntarily transferred the money to Aviva. Doc. 27 at 14-16. The Court finds, based on the reasoning in *Koss Corp.*, that Aviva may be liable for conversion.

An employee of Koss embezzled company funds by using checks drawn on Koss bank accounts to pay for her American Express credit card bills. *Koss Corp.*, 309 P.3d at 901-02. American Express became aware of the embezzlement as it was occurring, but failed to stop payments or alert Koss until months later. *Id.* The court found that "a conversion action can apply even to a third-party recipient of funds obtained for value who has *knowledge* of the fraudulent obtaining of the funds." *Id.* at 914 (emphasis

added).  The court explained:

> Koss had a possessory interest in the funds represented by the cashier's checks and wire transfers, which American Express allegedly interfered with when it cashed the checks allegedly knowing of Sachdeva's fraud and used the proceeds of the cashier's checks and wire transfers to pay the merchants who had provided goods or services to Sachdeva charged on her American Express account.  If [American Express] had knowledge that Sachdeva was embezzling funds from Koss to pay her American Express bills, it could be liable for conversion.

*Id.*  Although not explicitly stated, American Express' knowledge of Sachdeva's fraud was presumably sufficient to satisfy the other elements of conversion.  The knowledge would have required American Express to segregate and specially treat the funds it had received and would have given Koss a right to immediate possession of the funds.

Premier also had a possessory interest in the money it wired to Aviva to pay for the Kimballs' life insurance policies.  If Aviva received and used the funds knowing that they had been procured by fraud, Aviva may be liable for conversion.  Premier's complaint is not clear as to when Aviva became aware of the fraud.  Premier wired the $566,850 to Aviva on November 9.  Doc. 84, ¶ 80.  At the latest, Aviva was put on notice of the possibility of fraud when it received a letter from the Kimballs stating that they did not want a life insurance policy.  *Id.*, ¶¶ 97-98.  This letter was dated November 23.  Doc. 84-2 at 9.  Construing the facts in favor of Premier, *Cousins*, 568 F.3d at 1067, it is plausible that Aviva knew that Premier's money had been procured by fraud at the time of or shortly after receiving the money.  Under *Koss*, this would be sufficient to state a claim for conversion.  The Court will not dismiss Premier's claim of conversion.

### 6. Aiding & Abetting.

Under Arizona law, claims of aiding and abetting tortious conduct require proof of three elements: "(1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach."  *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 23 (Ariz.

2002) (citing *Gomez v. Hensley*, 700 P.2d 874, 876 (Ariz. Ct. App. 1984)); Restatement (Second) of Torts § 876(b)).  "[S]ubstantial assistance does not mean assistance that is necessary to commit the fraud.  The test is whether the assistance makes it 'easier' for the violation to occur, not whether the assistance was necessary."  *Id.* at 27 (citations omitted).  "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."  Restatement (Second) of Torts § 876 cmt. d; *see also Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 988 (Ariz. Ct. App. 2008).

Aviva argues that because its actions do not amount to an independent and separate tort, it cannot be liable for aiding and abetting Baldwin's fraud.  Doc. 27 at 17 (citing *Young v. Liberty Mut. Grp., Inc.*, No. CV-12-2302-PHX-JAT, 2013 WL 840618 (D. Ariz. Mar. 6, 2013)).  The Court agrees that Premier has failed to state a claim of aiding and abetting, but for different reasons.  For Premier's aiding and abetting claim, the primary tortfeasor is Richard Baldwin, who defrauded Premier.  Premier has alleged that at some point Aviva became aware of Baldwin's fraud.  *See* Doc. 84, ¶¶ 97-98.  Premier argues that Aviva substantially assisted or encouraged Baldwin's fraud by ratifying and concealing the fraud.  Doc. 40 at 17.  But these actions were taken after Baldwin had completed his fraud by presenting forged documents to Premier and Aviva, having Premier wire $566,850 to Aviva, and accepting Aviva's commission.  *See* Doc. 84, ¶¶ 74-86.  Aviva's alleged decision to ratify and conceal Baldwin's fraud after it occurred cannot be "a substantial factor in causing the resulting tort[.]"  Restatement (Second) of Torts § 876 cmt. d.  Premier has cited no authority to the contrary.  The Court will dismiss Premier's claim of aiding and abetting.

### 7. Constructive Fraud.

Constructive fraud has two elements.  First, there must be a confidential or fiduciary relationship between the parties.  *McAlister v. Citibank (Arizona), a Subsidiary of Citicorp*, 829 P.2d 1253, 1261 (Ariz. Ct. App. 1992) (citing *Rhoads v. Harvey Publ'ns, Inc.*, 700 P.2d 840, 846-47 (Ariz. Ct. App. 1984)).  Examples include "husband and wife,

1 parent and child, guardian and ward, attorney and client, partners, and joint
2 adventurers[.]" *Rhoads*, 700 P.2d at 847. "To establish a fiduciary (confidential)
3 relationship there must be something approximating business agency, professional
4 relationship, or family tie." *Id.* at 847. Second, there must be a breach of that
5 confidential relationship and its concomitant fiduciary duties that, "irrespective of the
6 moral guilt or intent of the party charged, the law declares fraudulent because of its
7 tendency to deceive others, to violate public or private confidence, or to injure public
8 interests." *Id.* at 846. A confidential relationship includes a "duty to make a full and
9 truthful disclosure of all material facts[.]" *Id.* at 846-47.

10 Aviva argues that Premier has failed to allege a confidential relationship between
11 Premier and Aviva. Doc. 27 at 17-18. The Court agrees. The extent of their relationship
12 is the wiring of money from Premier to Aviva – through a third-party company – and
13 Premier's subsequent requests for the return of the money. This is not sufficient to create
14 a confidential relationship. In *Rhoads*, the court considered whether a cartoonist who
15 worked for more than twenty years as an independent contractor for a publication had a
16 confidential relationship with that publication. *Id.* at 841-42. In finding no confidential
17 relationship, the court emphasized that "there was no great intimacy, disclosure of
18 secrets, or entrusting of power. Any superiority of position is no different than that
19 which would exist between any master and servant or employer-employee." *Id.* at 847.
20 Here also, there was "no great intimacy, disclosure of secrets, or entrusting of power"
21 between Premier and Aviva. Arguably their relationship is similar to debtor-creditor, but
22 Arizona courts have not found this to be a confidential relationship. *See McAlister*, 829
23 P.2d at 1258.

24 Premier argues that because it has alleged a claim for constructive trust, Aviva as a
25 constructive trustee had fiduciary duties to Premier. Doc. 40 at 17-18. But as discussed
26 above, a constructive trust is not a claim but rather a remedy, and cannot be used to
27 support a claim of constructive fraud. The Court will dismiss Premier's claim of
28 constructive fraud.

**IT IS ORDERED:**

1. Defendant Lengelings' Motion to Dismiss (Doc. 26) is **granted**.
2. Defendant Lengelings' Alternative Motion to Dismiss (Doc. 28) is **denied** as moot.
3. Defendant Aviva's Motion to Dismiss (Doc. 27) is **granted in part** as set forth above.

Dated this 8th day of December, 2014.

David G. Campbell
United States District Judge